**DENNY KLEPPER OIL COMPANY, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, Defendant.**

Civ. A. No. 84–0547.

United States District Court, District of Columbia.

Oct. 2, 1984.

William H. Bode, John E. Varnum, Tobey B. Marzouk, Washington, D.C., for plaintiff.

David A. Engels, Barry J. Sheingold, Dept. of Energy, Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This is an action for judicial review of a decision by the Department of Energy to grant a partial refund to Denny Klepper Oil Company representing the amount it was overcharged by its gasoline supplier, Vickers Energy Corp. Klepper and the department disagree on how much money Klepper is owed. The parties have filed cross-motions for partial summary judg-

ment, which have been fully briefed and argued.[1]

## I. The Refund Proceedings

The controversy begins with a consent order entered on May 11, 1979 between Vickers and the department's Office of Enforcement.[2] The order settled the department's allegations that Vickers had overcharged its customers of refined petroleum products from August 19, 1973 through March 1979, in violation of price regulations promulgated under the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, and the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.* Without admitting any legal violation, Vickers agreed to roll back prices at its own service stations and to pay $2.85 million into an escrow fund to provide refunds to those who bought Vickers gasoline at other than Vickers' own retail pumps, including companies like Klepper that bought gasoline wholesale from Vickers and resold it at their own service stations.

The consent order provided that the department's Office of Hearings and Appeals (OHA) would administer distribution of the escrow fund, as provided under regulations for special refund procedures, 10 C.F.R. §§ 205.280–205.288. A subsequent petition filed by the Office of Enforcement with OHA included joint recommendations from Vickers and the Office of Enforcement as to how OHA should make the distribution. Among other things the petition recommended

that, to the maximum extent practicable and consistent with sound public policy, the total amount of the escrow fund, excluding the cost of administration, if any, shall be distributed among the purchasers which the Office of Hearings and Appeals finds to be eligible and which duly apply for a portion of such funds.

After soliciting and receiving comments from Klepper and others as to how the distribution should be made, OHA proposed and later finally adopted standards for its refund procedure.[3] It decided to base a claimant's refund on the claimant's share of all the gasoline sold by Vickers (except through its own retail outlets) during the consent order period, rather than on the claimant's share of all the claims made. That assured that unless claims were filed for all the non-retail gasoline Vickers sold during the 5½-year period, money would be left over in the escrow fund after all claimants were paid. OHA proposed, but did not finally decide, to distribute such leftover money to public utilities in Vickers' marketing region, which would then roll back their rates by a corresponding amount, so that Vickers' ultimate consumers would be benefited.[4] OHA reasoned that if it merely divided the money among actual claimants not accounting for all gasoline sold, each claimant's share could be bigger than its actual injury. Moreover, it noted that the purpose of its special refund procedures for such cases, pursuant to 10 C.F.R., Part 205, Subpart V, was to provide restitution to as many injured customers as possible, thus making a two-step distribution, first to actual claimants and then to the utilities, more consistent than a distribution of all the money to the actual claimants.

1. The summary judgment motions reserve one issue requiring factual development, concerning the agency's calculation of Klepper's historic profit margin. The agency has moved for a remand to the Office of Hearings and Appeals on this issue, and Klepper has not opposed.

2. After a period for notice and comment, the order was adopted as a final consent order on Aug. 20, 1979. *See* 44 Fed.Reg. 48,751.

3. OHA's proposed Decision and Order with regard to the Vickers refund was issued on February 27, 1981. *See* 46 Fed.Reg. 15,320 (March 5,

1981). The final Decision and Order, incorporating the proposals made in the proposed order, was issued on July 17, 1981. *See Office of Enforcement (Vickers),* 8 DOE (CCH) ¶ 82,597 (1981).

4. It reached no final decision on this distribution of leftover funds pending completion of the initial distribution to claimants, reasoning that the amount left over would determine whether a distribution to utilities or a return of the money to the U.S. Treasury would be more efficient.

OHA also decided that to get a refund, a claimant would have to show that (1) it bought Vickers gasoline from other than Vickers' own service stations during the period covered by the consent order, and (2) if, like Klepper, it bought more than an average of 50,000 gallons a month, it "did not pass through the price increases to its own customers."

■ In order for companies to show that they had not passed on the price increases, OHA required submission of "data showing the applicant's unrecouped increased product costs (bank) for each calendar quarter for which the firm claims a refund." [5]

Klepper accordingly submitted data on its bank indicating that throughout the consent order period, the bank was increasing.[6] That showed that Klepper was "banking" at least some of its increased product costs during that time. But it did not necessarily show that Klepper was absorbing Vickers' illegal price increases, because other increased product costs during the same time could have accounted for some or all of the increased bank.

In May 1982, OHA sent letters asking for additional data from Klepper and other resellers of Vickers gasoline to "help us to decide the extent to which you absorbed the price increases...." The letter gave each claimant two options. Method A, which OHA said it preferred, required data on month-by-month prices by Vickers to the companies and corresponding data on the companies' prices to their own customers, along with the number of gallons bought and sold at each price. Method B, which OHA said should be used only if Method A data was not available, required monthly or quarterly figures on gross profits on sales of Vickers gasoline during the period, along with volume sold.

Klepper elected Method B, as its counsel explained in a cover letter to OHA, "because of the limitations of the firm's records and accounting system." In June 1982, it provided monthly figures for gross profit, gallons sold, and margin (profit per gallon).

In November 1982, OHA made a telephone request for additional data on "purchase or selling prices." Klepper complied by estimating its "weighted average cost of product" per gallon.[7]

On June 16, 1983, OHA issued its decision. It found that Klepper had purchased 99,321,001 gallons of Vickers gasoline during the consent order period and that its banks of unrecovered increased product costs "were sufficient to cover the refund applied for in all quarters of the consent order period." However, it found that Klepper had passed on to its customers 30 of the 34 Vickers price increases during the period.[8] It therefore determined that Klepper was entitled to a refund on only 29,711,120 gallons.

Although Klepper had elected Method B, providing gross profit data, OHA reached its passthrough determination using Method A, the pricing method. For Vickers' prices, OHA used Klepper's submitted figures on its monthly costs. OHA then came up with its own estimates of Klepper's

**5.** These "banks" are an accounting device whereby oil companies kept track of increases they were lawfully entitled to make on prices to their customers due to increase in their own costs, but which they did not in fact make. These foregone price increases accumulated in a company's bank until such time as the company decided to draw down on the bank by actually increasing prices.

**6.** Klepper also submitted required data on its monthly gallon totals of purchases from Vickers. That data showed Klepper had bought approximately 100 million gallons of gasoline from Vickers during the relevant period.

**7.** This estimate was derived by dividing the total cost of Klepper's purchases for a month by the volume of its sales that month. Klepper did not have available figures on its volume of purchases each month. Klepper also provided the price Vickers charged it for each grade of gasoline each month, known as the "rack price," but those prices did not include tax or transportation costs.

**8.** In the case of price reductions by Vickers, Klepper was found to have reduced its selling price by more than Vickers' reduction in 11 of 31 occurrences.

prices to its customers by adding together Klepper's estimate of its weighted cost per gallon with Klepper's estimate of its profit margin per gallon for the same month.[9]

Having reached the 29 million gallon figure using Method A, OHA then employed Method B to determine if Klepper should receive extra refunds for months when it had low profit margins. OHA explained that

> Generally, if a firm's profit margin declined substantially during a given period relative to its historical level, we would consider that decline to be evidence of injury to the firm resulting from Vickers' pricing practices. Decreases in profit margin were also considered in conjunction with changes in sales volume level, and an additional refund would be approved for months in which both profit margin and volume fell significantly below their historical levels.

OHA determined that Klepper's historic profit margin was 8 cents a gallon.[10] It determined that there were some months in which Klepper's profit margin was consistently below that average but because there were no significant decreases in volume in the same months, it attributed the low profit margins in those months to "seasonal marketing trends," not Vickers' unlawful prices. It gave no extra refund for these months.

Finally, OHA determined the dollar amount of Klepper's refund by multiplying the eligible gallonage, 29,711,120, times a refund amount per gallon. That figure, $.001783, was determined by dividing the total escrow fund by the total number of gallons Vickers sold during the consent order period. It ordered a refund of $52,-975 plus Klepper's share of interest in the escrow account.

## II. Discussion

On this motion for partial summary judgment, Klepper raises three issues. First, it contends as a matter of law that it could not be required to show that it did not pass on the overcharges to qualify for a refund. Second, it asserts that its refund per gallon should be calculated not on how many gallons Vickers sold during the consent period but on the gallons for which refund applications were made. Third, it contends that it made the required showing of no pass-on by demonstrating that its banks of unrecovered increased costs were greater than Vickers' overcharges during the period. The Department of Energy supports its position already taken contrary to each of these contentions.

### A. The Requirement of Injury

■■■ The Department of Energy has broad, though not unfettered, discretion in fashioning remedies for overcharges. See, e.g., Sauder v. Dep't of Energy, 648 F.2d 1341, 1348–49 (Temp.Emer.Ct.App.1981); S.O.S. Gasoline Enterprises, Inc. v. Dep't of Energy, 4 Energy Mgmt. (CCH) ¶ 26,321 at 28,459–28,460 (D.D.C.1981). Klepper correctly notes that the purpose of restitution is to refund overcharges to those hurt by them. But it does not follow that the Department is thereby limited to distributing all the escrow funds to direct purchasers of Vickers gasoline, without any showing that those purchasers were in fact injured. The two-part proceeding established by the Department in this case was an entirely proper way of trying to funnel refunds as much as possible to those actually injured by the overcharges, and it was well within the agency's authority. Klepper's chief authority for its contrary position, Citronelle-Mobile Gathering, Inc. v. Edwards, 669 F.2d 717 (Temp.Emer.Ct. App.), cert. denied, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982), provides Klepper no support. The case holds only that the Department has a duty to seek out and provide refunds to those actually injured. See id. at 723.

■■ Klepper also contends that the consent order between Vickers and the Department binds the agency to distribute all the funds to Vickers' direct purchasers, and

---

**9.** OHA disregarded the "rack price" data submitted by Klepper.

**10.** It did not explain how it derived this figure.

thus the agency may not require those purchasers to show injury. This is not so. The consent order by its terms provided that Vickers and the Department's Office of Enforcement would recommend to the Office of Hearings and Appeals that all the money be so distributed. This recommendation did not bind OHA. Accordingly, the Court cannot overturn the Department's requirement of a demonstration of actual injury.

### B. The Volumetric Distribution

■ Klepper uses the same language from the consent order, recommending distribution of all the escrow funds to eligible applicants, to support the contention that OHA erred in determining the share each applicant was to receive from the funds. Klepper contends that its refund should be based on the share of its total purchases to the total purchases of all actual applicants. OHA based the refund on an applicant's share of the total volume of gasoline that Vickers sold with overcharges. Under OHA's method, it is apparent that 100 percent of the funds would be distributed to actual applicants only if everyone who bought gasoline from Vickers during the consent order period applied. OHA eventually received applications covering only about two-thirds of the total volume.

The consent order's joint recommendation was conditioned on OHA's agreeing that distribution of the entire funds to actual applicants was "consistent with sound public policy." While OHA did not formally reach a final determination that such distribution was inconsistent with public policy, in its proposed and final decisions on

the refund procedure it clearly indicated that it believed such a distribution might provide inappropriate windfalls to the applicants at the expense of injured parties who did not apply. This was a reasonable conclusion,[11] and OHA's failure to formalize its public policy determination in so many weeks is at worst a minor defect too trivial to disturb. The volumetric method chosen by OHA is fair to all purchasers and has been used in other cases. *See, e.g., Amtel, Inc.,* 6 Energy Mgmt. (CCH) ¶ 90,055 at 90,094 (proposed order) (1984). Since there is an obvious rational basis for the decision, it will not be overturned.

### C. The Demonstration of Injury

As found above, OHA has clear authority to require a demonstration that Klepper and other applicants did not pass on the price increases to their customers. While the consent order suggested no particular way for claimants to make this showing,[12] leaving OHA free to establish its own procedures, a troublesome question remains of whether OHA acted arbitrarily in determining that Klepper did pass on approximately 70 percent of the overcharges. The Court believes OHA did act arbitrarily, though for somewhat different reasons than those advanced by Klepper.

■ Klepper contends that its showing that it had unrecovered increased product costs, or banks, during the consent order period is sufficient to show that it did not pass on the overcharges. While it is true that OHA initially required only such data, it is clear that the existence of banks is necessary but not sufficient to a showing that there was no pass-through. The ab-

---

**11.** Klepper argued that windfalls would not result from its method because the total amount placed in escrow by Vickers was a compromise settlement well below the actual overcharges suffered by the purchasers. OHA itself acknowledged this. *See Vickers Energy Corp./Unruh's, Inc.,* 10 DOE ¶ 85,006 at 88,020 (1982). Klepper's point is largely irrelevant. The purpose of the escrow distribution is to distribute funds equitably among those deserving. Even if an applicant did not receive a windfall—and the settlement of course precluded any accurate determination of the actual overcharges—its refund under Klepper's meth-

od still would be at the expense of injured non-applicants.

**12.** The consent order, and the subsequent petition filed with OHA containing the joint recommendations of Vickers and the Office of Enforcement, recommended only that "to the maximum extent practicable and consistent with sound public policy, the total amount of the escrow fund … shall be distributed among the purchasers which the OHA finds to be eligible and which duly apply…."

sence of banks would indicate that a company passed on all of its increased costs to its customers. But the presence of banks indicates only that a company absorbed some, but not necessarily all, of the cost increases it experienced. Moreover, because cost increases could be mixtures of legal and illegal price hikes, a company could show steadily increasing banks from its absorption of the legal cost increases while at the same time the illegal increases where being passed on to customers.

While it was thus proper for OHA to seek additional data from Klepper to show its injury, OHA subsequently followed a less than rational procedure that unfairly prejudiced Klepper's application.

 OHA's written request for additional data in the form of pricing (Method A) or of profit data (Method B) expressly allowed companies like Klepper to make their showing solely on profit data if pricing data was unavailable. Klepper so elected. OHA then, by oral request, sought and obtained other data from Klepper that it then pieced together into its own estimates of pricing data. Thus OHA in effect conducted a Method A analysis and used Klepper's Method B data only as a supplement to determine whether additional refunds should be granted after those determined by Method A. Once the Department had decided that either Method A or Method B would be sufficient by itself, it was unfair and arbitrary for it to change its mind with no notice.[13] An elementary requirement of administrative law is that an agency is bound by its own rules, *see, e.g., Pfizer, Inc. v. Heckler,* 735 F.2d 1502, 1507 (D.C.Cir.1984); *Teleprompter Cable Communications Corp. v. F.C.C.,* 565 F.2d 736, 742 (D.C.Cir.1977); *Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957). Even though

an agency has broad discretion in fashioning rules, *see Vermont Yankee Nuclear Power Corp. v. N.R.D.C.,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978), and in interpreting rules once fashioned, *see Dana Corp v. I.C.C.,* 703 F.2d 1297, 1300 (D.C.Cir.1983), once it has announced procedures, even informally as here, it must abide by them.

It is also apparent that OHA used the Method B analysis for a different purpose than it had announced. Its written request said the data would be used to determine the extent to which the applicant absorbed Vickers' price increases. A lower profit per gallon margin, in the absence of a much greater volume of sales indicating the company is making up in volume what it is losing in unit price, is evidence that a company absorbed the price increases. Instead of using this data as a primary indication of price pass-on, OHA used it only for the narrow purpose of determining whether there were months with a combination of low volume sales and low profit margins indicating additional injury to Klepper above and beyond the injury from absorbing price increases.[14]

This departure from procedures described in Method B which Klepper accepted and relied on to support its refund claim requires that the partial refund must be set aside. Confusion remains as to how the historical profit margin is determined pursuant to Method B. This must be resolved when a proper refund in accordance with that method is calculated.

The motion of defendant requesting remand for a limited purpose relating to the historical profit aspect of the case is clearly moot inasmuch as defendant's failure to base the refund to plaintiff solely in accordance with Method B necessitates reversal

---

**13.** There is no indication in the record that OHA gave Klepper any indication in its oral request for the additional data why it sought the data. Klepper had no reason to know that OHA would use its separate submissions of estimated cost and profit data to estimate pricing data.

**14.** OHA used this two-step process of making a primary determination through pricing data

and a supplemental one with profit data in other claims in the Vickers proceeding. The important distinction was that in those cases, it received actual data on the applicants' acquisition costs and selling prices and did not rely on its own estimates. *See Vickers Energy Corp./Unruh's, Inc.,* 10 DOE ¶ 85,006 at 88,019 (1982).

of its order and a further computation in any event.