**ATLANTIC RICHFIELD COMPANY, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.**

and

**Farmland Industries, Inc., the States of California, Indiana, Maryland, Michigan, and Ohio, Intervening Defendants.**

**Civ. A. Nos. 84–190, 84–735.**

United States District Court, D. Delaware.

Sept. 25, 1985.

---

1200

William O. LaMotte, III, and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs; David L. Roll, and Richard H. Porter, Steptoe & Johnson, Daniel Joseph, William Streets, and Merrill S. Spiegel, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Russell L. Sohn, Kansas City, Mo., of counsel.

Sue L. Robinson, Asst. U.S. Atty., Dept. of Justice, Wilmington, Del., Dennis G. Linder, and Brian G. Kennedy, Dept. of Justice, Donald W. Crockett, and Charles L. Cope, Dept. of Energy, Washington, D.C., for defendants.

Robert K. Payson, and Peter Sieglaff, Potter, Anderson & Corroon, Wilmington, Del., for intervening defendant Farmland Industries, Inc.; Peggy Grant-Cobb, Weeks, Thomas & Lysaught, Kansas City, Mo., of counsel.

Christopher Curtain, Deputy Atty. Gen., Wilmington, Del., for intervening State defendants; Paula Dinerstein, and James F. Flug, Lobel, Novins & Lamont, Washington, D.C., of counsel.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

As a byproduct of the mandatory petroleum price controls instituted during the oil crisis of the early 1970s, the United States Department of Energy ("DOE") has recovered over one billion dollars from various petroleum companies in settlement of claims of alleged violations of the federal

price regulations. The task of disbursing those funds to the victims of the violations has fallen largely upon DOE's Office of Hearings and Appeals ("OHA") pursuant to its authority under 10 C.F.R. Part 205, Subpart V (1984) ("the Subpart V provisions" or "the Subpart V regulations"). The Subpart V provisions, promulgated by DOE in 1979, establish special procedures for the distribution of refunds when those injured by a violation of DOE regulations are not readily identifiable. In 1981, the Economic Regulatory Administration ("ERA") of the DOE petitioned OHA to assume jurisdiction over thirty-one cases necessitating action under Subpart V. This civil litigation involves OHA's final decisions in two of those cases.

In the cases in question, National Helium Corporation ("National Helium") and Coline Gasoline Corporation ("Coline") signed consent orders with DOE agreeing to pay into escrow $10 million and $628,480.79, respectively, to be distributed to those injured by the corporations' sales of natural gas liquids ("NGLs") and natural gas liquid products ("NGLPs")[1] at prices above federally established limits. Three parties filed claims to all or part of the $10 million National Helium fund: Atlantic Richfield Company ("ARCO"), the sole direct purchaser of National Helium's NGLs and NGLPs during the period covered in the consent order; Farmland Industries, Inc. ("Farmland"), a cooperative agricultural association; and the Controller of the State of California ("State of California"), as representative of all California end-users of NGLPs or of goods produced using NGLPs. Claims to the smaller Coline fund were filed by Petrolane Incorporated ("Petrolane") and Mobil Oil Corporation ("Mobil") as direct purchasers of Coline's NGLPs, and by the State of California.

On March 27, 1984, OHA rendered a final decision on the National Helium account, awarding ARCO $760,982 and Farmland $1,201,072, plus proportionate shares of the accrued interest in the account. On May 21, 1984, OHA issued a final order in the Coline case, granting Petrolane $253,157, plus interest, and denying Mobil any recovery. In both cases, OHA denied the State of California's claim, subject to reevaluation in "second stage" proceedings.[2]

On April 6, 1984, ARCO and National Helium[3] instituted this civil action against DOE and several of its officials.[4] In essence, ARCO contends that it is entitled to the entire $10 million in the National Helium account and that OHA's decision should be set aside as exceeding its authority and

---

1. NGLs are liquified hydrocarbons separated from the "wet" natural gas produced by gas and oil wells. NGLs are removed from the wet gas stream at gas processing plants through refrigeration, absorption, and adsorption. NGLs are generally composed of propane, butane, ethane, and natural gas. Each of these natural gas liquid products is produced by fractionating the raw NGLs. Certain NGLPs, including propane, can also be produced by crude oil refineries. For a discussion of the regulation of NGLs and NGLPs, see *Mobil Oil Corp. v. FEA*, 566 F.2d 87 (Temp.Emer.Ct.App.1977).

2. OHA has since completed its second stage proceedings in both the National Helium and Coline cases. Funds in the National Helium case were allocated in varying amounts to 37 states and the District of Columbia. Docket Item ("Dkt.") 38, Appendix A. Funds in the Coline case were similarly allocated to 48 states and the District of Columbia. Dkt. 50. Each state must submit a restitution plan for DOE approval before it can receive its designated sum.

3. In 1978, ARCO filed suit in the United States District Court for the District of Kansas to re-

cover over $4 million in overcharges on NGLPs sold between May, 1974 and December, 1974. *Atlantic Richfield Co. v. National Helium Corp.*, No. 78–1271 (D.Kan. filed June 30, 1978). A copy of that Complaint is contained in the National Helium administrative record filed with this Court. *See* DOE Administrative Record, National Helium Corp., Dkt. 8G at 328. In settlement of the Kansas action, National Helium has agreed to pay ARCO a stipulated sum, less any amount recovered from the National Helium escrow account. It is apparently because of this settlement agreement that National Helium has joined in the Complaint. Unless otherwise indicated, ARCO and National Helium will be referred to jointly as "ARCO" in their role as plaintiffs in this action.

4. The Complaint names DOE, its Secretary, Donald P. Hodel, the Administrator of ERA, Rayburn Hanzlik, the Director of OHA, George Breznay, and the Acting Director of Departmental Accounting of DOE, Carl Guidici. Dkt. 1.

lacking substantial evidence. By stipulation of the parties and with the approval of the Court, Farmland Industries has intervened as a party defendant. Dkt. 11. The States of California, Indiana, Maryland, Michigan, and Ohio have also intervened as defendants in the action.[5] Dkt. 37.

Mobil Oil Corporation filed suit in the Coline case on December 13, 1984,[6] asserting that OHA's decision was arbitrary and capricious and not in accordance with law. Mobil seeks a declaration that it is entitled to 26.7% of the Coline escrow fund to replace its lost profits, or alternatively, to $26,281.50 from the fund under OHA's "competitive disadvantage" theory.

Because of the common issues raised by the pleadings, the actions were consolidated on December 21, 1984, for purposes of briefing, argument, and decision. The matter is currently before the Court on cross-motions for summary judgment.

## I. The Administrative Proceedings

### A. The National Helium Case

Between 1973 and 1979, Atlantic Richfield purchased from National Helium all of the NGLPs processed at the latter's gas processing plant in Liberal, Kansas. The NGLPs were priced above the maximum allowable under federal regulations. On June 30, 1978, Atlantic Richfield filed suit against National Helium in United States District Court for the District of Kansas to recover a total of $4,475,170.81 plus interest, representing overcharges allegedly paid from May, 1974 through December, 1974. See Dkt. 8G at 328.

At about the same time, DOE was conducting its own investigation of National Helium's pricing practices. On February 15, 1979, the ERA issued a Notice of Probable Violation claiming that National Helium had overcharged ARCO more than $14 million for NGLPs sold between September, 1973 and September, 1977. Dkt. 8G at 71. On January 30, 1980, National Helium and the ERA entered into a consent order whereby National Helium agreed to pay $10 million to be held in escrow by DOE,[7] "monies to ... be distributed in a just and equitable manner in accordance with applicable laws and regulations including the [special refund] provisions of 10 C.F.R. Part 205, Subpart 'V.'" Dkt. 8G at 6.

The ERA published notice of the consent order in the Federal Register and invited interested parties to comment and to submit claims for refunds. See 45 Fed.Reg. 9057 (1980).[8] On March 12, 1980, ARCO filed a claim to the entire National Helium fund. Dkt. 8G at 11–12. In addition, ARCO agreed to dismiss with prejudice its civil action against National Helium in exchange for an amount to be reduced by any recovery obtained via the DOE proceedings. At this stage of the administrative process, no other parties claimed any of the National Helium fund. See Notice of the

---

5. The States of Arkansas, Delaware, Louisiana, Nevada, Rhode Island and West Virginia moved for leave to file an amici curiae brief. Because the motion was filed after the completion of all briefing and after oral argument, the motion was denied. Dkt. 54.

6. Mobil's Complaint names as defendants the DOE, Secretary Hodel, and Director of OHA, George Breznay. Dkt. 19

7. National Helium also agreed to pay $75,000 in settlement of any liability for civil penalties under 10 C.F.R. § 205.203. Dkt. 8G at 7.

8. The notice stated, in pertinent part:
   The DOE intends to distribute the refund amounts in a just and equitable manner in accordance with applicable laws and regulations. Accordingly, distribution of such refunded overcharge requires that only those "persons" (as defined at 10 CFR 205.2) who actually suffered a loss as a result of the transactions described in the Consent Order receive appropriate refunds. Because of the petroleum industry's complex marketing system, overcharges may have been passed through as higher prices to subsequent purchasers or offset through devices such as the Old Oil Allocation (Entitlements) Program 10 CFR 211.67. In fact, the adverse effects of the overcharges may have become so diffused that it is a practical impossibility to identify specific, adversely affected persons, in which case disposition of the refunds will be made in the general public interest by an appropriate means such as payment to the Treasury of the United States pursuant to 10 CFR 205.-199I(a).

Action Taken on Consent Order, 45 Fed. Reg. 77,506 (1980).

On April 6, 1981, following a request by ERA to implement Subpart V proceedings, OHA accepted jurisdiction to determine entitlement to the National Helium account. Decision and Order, *In re National Helium Corp.*, Case No. BRZ–0091 (Apr. 6, 1981), Dkt. 8G at 73–76. Several months later, OHA outlined the basic criteria it would apply in apportioning the funds. Decision and Order Establishing Special Refund Procedures, Dkt. 8G at 345.[9] OHA indicated it would accept applications for refunds from all claimants, including first purchasers and representatives of consumer groups, during the first phase of a two-step process. First purchasers would receive refunds only upon proof of "actual injury" from the overcharges. To that end, an applicant would be required to show the existence of "cost banks" of unrecovered increased product costs[10] which exceeded the amount of the alleged overcharges. If sufficient cost banks were shown to exist, the claimant would then have to proffer "some type of additional evidence, depending upon the size and nature of [the] firm, to demonstrate that it indeed was injured by the alleged overcharges." *Id.* at 354. OHA suggested, as an example, the use of market surveys as evidence that prices could not be increased to recover the overpayments. *Id.* at 362. OHA anticipated the need for a second-stage proceeding, whose specifics it did not discuss, to distribute any funds remaining after payment of all meritorious stage-one claims.

Shortly thereafter, OHA received three applications for refunds from the National Helium account. First, ARCO claimed entitlement to the entire sum as the sole direct purchaser of National Helium NGLs and NGLPs. Dkt. 8D at 375. Second, Farmland claimed that it had purchased from ARCO propane that had come from the National Helium plant in Liberal, Kansas. Farmland thus requested a refund commensurate with the amount of propane purchased from ARCO during the consent order period.[11] Finally, the State of California requested a refund as representative of all California end-users of NGLPs or of goods produced using NGLPs.

In its application, ARCO contended, *inter alia*, that OHA had erected unreasonable and unlawful obstacles to prevent direct purchasers from recovering under the Subpart V procedures. In particular, ARCO challenged OHA's application of a "pass-on" concept to defeat direct purchasers' claims for restitution. ARCO argued that the existence of cost banks "does not accurately show that the overcharges were absorbed." Dkt. 8D at 376–78. Assuming, however, that OHA could lawfully require proof that a direct purchaser had absorbed the overcharges, ARCO contended that its proffer of unrecovered or "banked" costs in excess of the amount of National Helium's overcharges was sufficient to entitle it to the requested relief. In addition, ARCO submitted "market survey" information from Platt's Oil Price Handbook, which listed regional prices for propane from 1973 to 1979.[12] A compilation of

---

**9.** OHA's decision also applied to four other overcharge cases, including the Coline case, for which ERA sought implementation of the Subpart V provisions.

**10.** Federal price controls generally limited the ability of refiners to raise prices over base prices established pursuant to the regulations. Refiners were permitted, however, to increase the price of their petroleum products by amounts calculated to permit recovery of allowable increased costs. 38 Fed.Reg. 25687 (1973). When market or other conditions prevented a refiner from increasing prices to recover increased costs, the refiner was permitted to "bank" its costs and recover them in subsequent

periods. 10 CFR § 212.83(c). If a refiner did not have a "bank" in excess of the alleged overcharge, it is presumed the overcharge was "passed through" with the consequence that there was no injury to the first purchaser.

**11.** Farmland indicated any refund it received would be passed on to its member cooperatives in proportion to their purchases of propane from Farmland.

**12.** ARCO subsequently submitted an affidavit to OHA averring that the data from Platt's Handbook was submitted at OHA's suggestion in response to ARCO's request for an explanation of

prices for other types of NGLPs purchased from National Helium allegedly was non-existent.

On August 19, 1982, OHA issued a proposed order assessing entitlement to the National Helium fund. OHA rejected ARCO's arguments concerning the burden of proof imposed on a direct purchaser and reiterated that adequate proof of injury, or more specifically proof that ARCO had not passed on the overcharges, was necessary before ARCO could recover. Dkt. 8B at 562–65. OHA concluded, however, that ARCO had shown merely that its cost banks exceeded the amount of the overcharges and had failed to show the requisite injury.

OHA articulated an alternate method to establish injury, the "competitive disadvantage" test, which was based on a "comparison between national average wholesale prices and the prices which the claimant was charged by the firm involved in the consent order." Dkt. 8B at 565. Using this theory, OHA compared for each quarter industry-average market prices with the average prices National Helium charged ARCO for propane, butane, and natural gas. OHA concluded:

ARCO was generally able to obtain products from [National Helium] at prices which were well below the average prices prevailing in the marketplace and presumably paid by ARCO's competitors. It therefore appears that ARCO's profitability and competitive position were actually enchanced [sic] by its relationship with [National Helium]. It is true that ARCO's profits might have been greater

in the absence of the alleged [National Helium] violations. However, in the past we have found that a cognizable injury has occurred if a firm's competitive position has been harmed or if its overall profitability has been measurably reduced as a result of paying unlawful prices established by a supplier."

*Id.* at 567. OHA proposed that ARCO should recover only for the twelve-month period during which National Helium's prices exceeded average market price levels. On that basis, OHA assessed ARCO's recovery at somewhere between $775,978 and $0. OHA then fixed ARCO's award at the midpoint of the range, or $387,989.

OHA treated Farmland's claim quite differently. Since OHA believed that any refunds received by a cooperative association would enure to the benefit of end-users and consumers of the products purchased by the cooperative, OHA did not require that Farmland make any showing of injury. *Id.* at 570. Instead, OHA proposed to award Farmland 13% of the National Helium fund, for a total of $1,300,000. That award was premised on a finding that Farmland purchased from ARCO propane that originated at National Helium's Liberal, Kansas, plant and . that Farmland's propane purchases equalled 13% of all NGLPs sold by National Helium to ARCO. OHA's proposal required Farmland to pass on the refunds to its downstream customers or forfeit its share of the refund to the extent that it failed to do so. *Id.* at 571.[13]

OHA declined to honor the State of California's application during the first stage of the refund proceedings. Rather, OHA

---

how OHA's standard could be satisfied. Dkt. 8C at 816.

**13.** There is prior administrative agency authority for the proposition that end-users, such as an agricultural cooperative, are excluded from the requirement of demonstrating injury as a result of overcharges. This same result was reached in *Office of Special Counsel: In the Matter of Tenneco Oil Company; Washington, D.C.* (Case No. BEF–0073), 9 DOE Para. 85,197, 85–203 (1982):

[W]e believe that refunds to any agricultural cooperative will ... directly influence the refund recipient's prices. These co-

operatives are owned by their customers, and the ultimate customer of the petroleum products purchased by the cooperative will therefore receive the benefit of the refund either as a price reduction or as a distribution at the close of the cooperative's fiscal year. Consequently, we have concluded that refund applications from firms whose prices for goods or services are regulated by a government agency or by the terms of a cooperative agreement will not be required to show that they absorbed the alleged ... overcharges. (RF3, p. 623).

requested that California, as well as other states that wished to make claims to the funds, submit applications in stage two of the distribution process.

OHA afforded the applicants thirty days to comment on its proposed decision and noted that in the absence of such comments, the proposal could be made final without further consideration. Shortly thereafter, ARCO and National Helium requested discovery of the data and methodology underlying OHA's competitive disadvantage theory. They also requested an extension of time within which to comment on the proposed decision, particularly with respect to OHA's competitive disadvantage analysis. Dkt. 8G at 660. OHA granted a brief extension of time in which to comment on the proposal but denied the request for discovery of the underlying data.

On October 4, 1982, ARCO submitted extensive comments on OHA's preliminary decision. Specifically, ARCO contended that OHA's standards were arbitrary, capricious, inconsistent with the regulatory scheme and in violation of due process.[14] ARCO produced several affidavits in support of its arguments. John A. Storm, Manager of Natural Gas Liquids Operations for ARCO Petroleum Products Company ("ARCO Petroleum"), a division of ARCO, attested that ARCO's prices during the relevant period were established by market forces and would not have been lower had there been no overcharge. Storm therefore concluded that National Helium's alleged violations resulted in a loss of profits to ARCO. Dkt. 8C at 810–13. Bertrand A. Levesque, Manager for financial administration and operations control in the Crude Supply and Coordination Department of ARCO Petroleum, made a similar statement. *Id.* at 818–21. ARCO also submitted economic analysis from two consulting firms, challenging DOE's finding that ARCO had not proven injury. In

addition, the economists attacked OHA's competitive disadvantage test both in theory and as applied to ARCO. *See* An Analysis of Economic Damages to the Atlantic Richfield Company, Robert R. Nathan Associates, Inc. (Oct. 18, 1982), Dkt. 8F at 1496; Purvin and Gertz, National Helium Corporation Economic Analysis of Natural Gas Liquid Pricing (Oct. 1982), Dkt. 8C at 1379.

OHA's final decision on the National Helium fund, issued on March 17, 1984, varied only slightly from its proposed order. *See National Helium Corp./Atlantic Richfield Co.*, 11 DOE ¶ 85,257 (1984).[15] Again OHA rejected ARCO's contention that ARCO, as the sole direct purchaser of National Helium's NGLs and NGLPs, was automatically entitled to the full amount of the escrowed funds. OHA emphasized the need for a direct purchaser to prove actual injury, and adhered to its earlier determination that ARCO had failed to muster sufficient evidence of any harm. OHA's order stated, "[a] demonstration of injury ... requires more than a showing that cost banks exist, or unsubstantiated allegations that a firm absorbed the effect of cost increases." *Id.* at 88,463. OHA described several methods whereby injury could have been established:

> [A] firm may demonstrate its eligibility for a refund by providing detailed information regarding the firm's marketing operations which establishes that it did not raise its sales prices to recover increased costs attributable to particular alleged regulatory violations. *See, e.g., Vickers Energy Corp./Unruh's Inc., et al.*, 10 DOE ¶ 85,006 (1982). Alternatively, a firm may prove that competitive market conditions prevented it from raising its prices to recover any or all of the alleged overcharges. *Id.* Injury may also be established by showing that as a

---

**14.** ARCO also challenged OHA's authority to accept jurisdiction to implement Subpart V procedures where the first purchaser of the overcharged products had been identified. This jurisdictional question was included as Count I of ARCO's Complaint. ARCO has since withdrawn

Count I, along with Counts VI, X, XI, XII, and XV. *See* Plaintiff's Motion for Summary Judgment, Dkt. 21 at 1.

**15.** The amount of ARCO's award, however, doubled from $387,989 to $760,982.

direct result of particular alleged overcharges, a firm suffered a significant decline in sales volume and market share. However, we have consistently maintained that inconclusive market data ... cannot serve as an adequate documentation of injury. *See, e.g., Tenneco Oil Co./Chevron U.S.A., Inc.,* 10 DOE ¶ 85,-014 (1982).

*Id.* at 88,463–64. OHA observed that ARCO had failed to prove injury under any of the above methods and had merely relied upon its cost banks to demonstrate that the overcharges caused lost profits. Implicit in OHA's ruling was a finding that the affidavits and economic analysis submitted in support of ARCO's claim were simply a restatement of ARCO's cost bank argument, an argument OHA had patently rejected.

OHA proceeded to discuss its competitive disadvantage theory as an alternative measure of injury. Contrary to ARCO's contention, OHA found that the theory provided a fair, relatively simple, and reasonably accurate means of assessing recovery to a direct purchaser. In response to the State of California's objection that the theory allowed recovery even if the overcharges were passed on, OHA explained:

> We have noted that to determine the extent to which increased costs were passed through is a complex undertaking and could not be accomplished without requiring a firm to provide a detailed analysis of its marketing operations throughout the consent order period. Even with such an analysis, the findings may be inconclusive. Thus, although the pass through of higher prices may have occurred, we believe it is unreasonably burdensome to require a first purchaser to provide conclusive evidence that increased costs were not passed through, in addition to showing that it experienced a competitive disadvantage.

*Id.* at 88,469.

OHA then applied the competitive disadvantage methodology to determine the extent of ARCO's injury. First, national average prices of propane, butane, and natural gasoline were compared with the prices which National Helium charged ARCO for the same products during the consent order period. Second, OHA employed three measures of injury to gauge the competitive disadvantage that ARCO may have suffered:

> The first measure is based on the number of barrels of NGLPs purchased by ARCO from [National Helium] at prices which exceeded national average price levels. This volumetric measure was translated into an amount of refund equal to the proportion of total barrels purchased which were "excessively priced" multiplied by the total refund monies available. The second measure is the gross excess cost incurred by ARCO. This equals the sum of ARCO's purchase costs for [National Helium's] products which exceeded average market costs. The third measure is the net excess cost paid by ARCO. This equals the gross excess cost minus the amount by which ARCO's purchase costs for [National Helium's] products were below average market costs.

*Id.* at 88,469. Using price data from the Monthly Petroleum Product Reports published by the Energy Information Administration ("EIA"), OHA found that 15.22% of the NGLPs that ARCO purchased from National Helium during the relevant period, or a total of 3,336,177 barrels, were sold to it at prices exceeding national average levels. Multiplying the total number of barrels by the per barrel refund amount, ARCO was eligible for a refund of $1,521,-964. *Id.* at 88,473.

OHA found, however, that ARCO purchased NGLPs at prices above average market levels during only four quarters. Calculating the difference between ARCO's purchase price and the average market price during those four quarters and multiplying that figure by the volume of purchases, OHA arrived at gross excess cost figures for ARCO of $359,388 for propane, $401,995 for butane, and $0 for natural gas. OHA netted these figures against computations for remaining quarters when

ARCO had purchased NGLPs at less than the average market price and concluded that ARCO enjoyed a substantial cost benefit overall.

Based on the foregoing calculations, OHA assessed ARCO's "refund range" to be between $0 (because of ARCO's substantial net cost benefit) and $1,521,964 (representing a share of the consent order funds equal in proportion to the volume of ARCO's purchases at prices above the market average). OHA in effect "split the difference" with ARCO and awarded a refund of $760,982.

Using the same rationale articulated in the proposed decision, OHA awarded Farmland $1,201,072 of the National Helium funds (13% of the amount remaining after distribution to ARCO). OHA denied the State of California's application, pending reconsideration in the second-stage proceedings.

ARCO now petitions this Court to reverse OHA's decision and to award it the full $10 million.

### B. The Coline Case

Except for the difference in the size of the fund and the parties involved, the administrative proceedings in the Coline case were almost identical to those outlined in the National Helium matter. Consequently, only a few salient features of the Coline proceedings need be discussed here.

Mobil's claim to a portion of the Coline account stems from its purchase of NGLPs from Coline's Rincon plant in California between June 1, 1974 and November 30, 1975. Most of these NGLPs were used in the manufacture of motor gas at Mobil's Torrance, California refinery. Mobil and Petrolane were the only direct purchasers of Coline NGLPs during the relevant period. The DOE audit of Coline's sales of NGLPs found that 26.7% of Coline's overcharges could be linked to sales to Mobil and that the remaining 73.3% were attributable to sales to Petrolane. Mobil and Petrolane each claimed refunds in proportion to the amount of their purchases. The State of California sought recovery on behalf of its citizens, as it had in the National Helium matter.

In support of its application, Mobil submitted evidence that its banks of unrecouped costs were increasing during the consent order period. Mobil relied on the banks as proof that market forces prevented the firm from raising prices to recover the overcharges, and supplemented the cost-bank data with an economic analysis similar to that presented by ARCO. In addition, Mobil proffered evidence that its market share for motor gasoline sales in California during the consent order period had declined and, indeed, had never fully recovered. Mobil offered to provide additional market-share data if OHA indicated that such information would be helpful. Application for Refund of Mobil Oil Corp., Dkt. 46 at 13–16. Finally, Mobil compared its increased cost pass-through in motor gasoline sales with publicly available data for other major oil companies from December, 1975 through January, 1981. *Id.* at 15.

In a decision that paralleled the earlier National Helium opinion, OHA found insufficient Mobil's evidence of injury. *Coline Gasoline Corp./Mobil Oil Corp.*, 12 DOE ¶ 85,029 (1984). OHA compared Mobil's purchases of Coline NGLP's to the EIA price data and concluded that Mobil had suffered no competitive disadvantage during the relevant period. OHA did, however, award Petrolane a refund of $253,157 plus a proportionate share of the accrued interest in the fund. Finally, OHA denied the State of California's claim, pending reevaluation in the second-stage proceedings.

Mobil initially challenged OHA's decision in the United States District Court for the Northern District of New York. That action was voluntarily dismissed without prejudice and Mobil's claim was renewed in this forum.

### II. The Regulatory Scheme

It has frequently been recognized that DOE and its predecessor agencies have been endowed with the implied statutory authority to issue remedial orders requir-

ing refunds of overcharges caused by violations of federal price-control regulations. *See, e.g., Bulzan v. Atlantic Richfield Co.,* 620 F.2d 278 (Temp.Emer.Ct.App.1980); *Bonray Oil Co. v. Department of Energy,* 472 F.Supp. 899 (W.D.Okla.1978), *aff'd and opinion adopted,* 601 F.2d 1191 (Temp. Emer.Ct.App.1979). Although the limits of DOE's remedial powers have not been precisely delineated, its authority has been interpreted liberally in accordance with the broad congressional policies that DOE is bound to enforce. *See Sauder v. Department of Energy,* 648 F.2d 1341, 1348–49 (Temp.Emer.Ct.App.1981) (no indication that the power of the courts or the agency is limited to restitution); *Bonray Oil Co. v. Department of Energy,* 472 F.Supp. 899, 904 (W.D.Okla.1978), *aff'd and opinion adopted,* 601 F.2d 1191 (Temp.Emer.Ct. App.1979); *Getty Oil v. Department of Energy,* 569 F.Supp. 1204 (D.Del.1983), *aff'd as modified,* 749 F.2d 734 (Temp. Emer.Ct.App.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1176, 84 L.Ed.2d 325.

In 1979, DOE's delegate, the OHA, promulgated the Subpart V provisions to facilitate the systematic exercise of DOE's remedial authority in those cases where the victims of regulatory violations were not readily ascertainable.[16] The purpose and scope of Subpart V is articulated in 10 C.F.R. § 205.280, which states, in pertinent part:

This subpart establishes special procedures pursuant to which refunds may be made to injured persons in order to remedy the effects of a violation of the regulations of the Department of Energy. This Subpart shall be applicable to those situations in which the Department of Energy is unable to readily identify persons who are entitled to refunds ... or to readily ascertain the amounts that such persons are entitled to receive.

The special refund procedures may be triggered at the request of the Special Counsel of DOE, the ERA Office of Enforcement, or any other enforcement official of DOE when the criteria of § 205.280 are met. 10 C.F.R. § 205.281. When any of the above officials submits a "Petition for the Implementation of Special Refund Procedures," OHA must review its contents and issue a Proposed Decision and Order describing "the nature of the particular refund proceeding and [setting] forth the standards and procedures that the Office of Hearing and Appeals intends to apply in evaluating refund claims." 10 C.F.R. § 205.282. The proposed decision must be published in the Federal Register and the public must be given an opportunity to comment. *Id.* OHA then issues a final Decision and Order which delineates the "standards and procedures" to be used in evaluating individual Applications for Refunds. The standards and procedures must be consistent with the provisions of Subpart V and must be derived with an eye toward the "efficient, effective and equitable" distribution of the funds and the resolution, to the maximum extent practicable, of all outstanding claims. *Id.* "In order to do so, the standards for evaluation of individual claims may be based upon appropriate presumptions." *Id.*

## III. Analysis

### A. Standard of Review

Before turning to the merits of plaintiffs' contentions, it is necessary to consider the scope of judicial review of OHA's decisions. Section 211(d)(1) of the Economic Stabiliza-

---

**16.** The provisions were promulgated pursuant to the authority of five economic regulatory statutes all having similar purposes—the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note ("to provide for the rational and equitable distribution of [petroleum] products"); the Emergency Petroleum Allocation Act of 1975, 15 U.S.C. § 751 *et seq.* (to permit the "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices"); the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 *et seq.* (to maintain "fair and reasonable consumer prices" for scarce energy supplies); the Department of Energy Organization Act, 42 U.S.C. § 7111 *et seq.* ("to promote the interests of consumers through the provision of an adequate and reliable supply of energy at the lowest reasonable cost"); and the Energy Policy and Conservation Act, 42 U.S.C. § 6201 note ("to reduce demand for energy through the implementation of energy conservation plans....").

tion Act of 1970 provides the relevant framework. That section states, in pertinent part:

> [N]o order of [DOE] shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

12 U.S.C. § 1904 note.

The meaning of those terms is well known in the context of administrative law and requires little elaboration. As the Temporary Emergency Court of Appeals ("TECA") has repeatedly stated, "a court is not empowered to substitute its judgment for that of the agency," *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1400 (Temp.Emer.Ct. App.1975), and must affirm the agency's decision as long as there is "no clear error of judgment and there is a rational basis for the conclusions approved by the administrative body." *Grigsby v. Department of Energy*, 585 F.2d 1069, 1074 (Temp.Emer. Ct.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979). In challenging the agency's action, the plaintiff bears the burden of proof. Only upon a "clear showing that the decision exceeds the agency's authority or is based on findings not supported by substantial evidence" can plaintiff succeed in its challenge. *Exxon v. Department of Energy*, 601 F.Supp. 1395 (D.Del.1985).

### B. Plaintiffs' Motion for Summary Judgment—The Requirement of Injury

Plaintiffs contend that OHA acted arbitrarily and in excess of its authority by failing to award plaintiffs "restitution" and by rejecting lost profits as a form of injury. In addition, plaintiffs assert that OHA's application of different standards to direct and downstream purchasers violates plaintiffs' right to due process.

To understand these contentions, it may be helpful to review what is *not* at issue in this litigation. Plaintiffs do not question

OHA's authority to grant restitution to parties injured by unlawful overcharges. *See* Plaintiffs' Principal Brief in Support of Summary Judgment, Dkt. 22 at 6, 29 n. 73. Nor do they deny that a first purchaser claiming a refund under 10 C.F.R. Part 205, Subpart V, bears the burden of proving such injury. Although there is considerable difference of opinion among the parties over what constitutes "injury" in this context, it is clear that the term connotes more than the mere payment of an unlawful overcharge. *See Denny Klepper Oil v. Department of Energy*, 598 F.Supp. 522 (D.D.C.1984); *In re S.O.S. Gasoline v. Department of Energy*, 4 DOE ¶ 26,321 (D.D. C.1981).[17]

Thus, unless plaintiffs adequately substantiated their claim of injury, OHA had no obligation to award restitution. The Court therefore turns to OHA's determination that plaintiffs' evidence of injury was insufficient. Only if that determination is found to have been arbitrary or in excess of the agency's authority need the question of restitution be addressed.

OHA's finding that plaintiffs failed to satisfy their burden of proof rests essentially upon the agency's requirement that a direct purchaser prove it absorbed, rather than passed on, the unlawful overcharges. In other words, OHA demanded that these first purchasers demonstrate a direct link between the overcharge and their claim of injury. As OHA repeatedly explained, that link could not be established merely by showing the existence of cost banks which exceeded the amount of the overcharge. Some additional showing, supported by concrete data, was necessary before the agency could conclude that the overcharge had not been passed downstream.

■ Although plaintiffs concede they had the burden of proving injury, they object to having borne the burden of proving nonpass-through. They argue that imposition of that burden is premised upon a presumption that first purchasers passed

---

**17.** A contrary rule has been applied in the context of private enforcement actions under § 210 of the ESA, 12 U.S.C. § 1904 note. *See infra* pp. 1211–1212 & n. 15.

their increased costs on to their customers, a presumption which plaintiffs submit has no basis in the record. Moreover, plaintiffs assert that it was neither industry practice, nor a requirement of the federal regulations, to maintain records which would allow plaintiffs to trace specific cost increases to the computation of a particular price charged. Since such data is unavailable, ARCO contends that the agency has, in effect, imposed an irrebutable presumption of pass-through. Plaintiffs urge that instead of applying such an insurmountable standard, OHA should have accepted their evidence of "lost profits" as proof of injury.

While having superficial attractiveness, plaintiffs' arguments ultimately are unpersuasive. OHA's requirement of proof of nonpass-through is entirely reasonable and well within OHA's authority. As TECA has recently noted, where an overcharge has occurred, it is not unlikely that the overcharge will be passed on so that, "in the end, the public is the loser." *Payne 22, Inc. v. United States*, 762 F.2d 91, 94 (Temp.Emer.Ct.App.1985); *accord Denny Klepper Oil v. Department of Energy*, 598 F.Supp. 522, 526, 527 (D.D.C.1984); *In re Department of Energy Stripper Well Exemption Litigation*, 578 F.Supp. 586, 594 (D.Kan.1983). The basis for OHA's presumption is strengthened by the very structure of the price control regulations. Under the regulations, refiners such as ARCO and Mobil were generally permitted to pass on their increased costs to the full extent that the market would bear. *See, e.g.,* § 4(b)(2)(A) of the EPAA, 15 U.S.C. § 753(b)(2) (A); 10 C.F.R. § 212.83(c), (d); 10 C.F.R. Part 212, Subparts F and L. Indeed, plaintiffs do not dispute that while substantial sums were amassed in cost banks, the size of these banks was small in comparison to the huge cost increases that were passed on to downstream consumers.

Perhaps most important, OHA's requirement that a direct purchaser prove non-pass-through is consistent with the equitable principles under which the Subpart V provisions must operate. OHA possesses the "inherent equitable power ... to set things right and order restitution." *Sauder v. Department of Energy*, 648 F.2d 1341, 1348 (Temp.Emer.Ct.App.1981). In that regard, the Court agrees with Judge Theis' statement in *In re Department of Energy Stripper Well Exemption Litigation, supra,* that "allowing first purchasers to retain all of the overcharges, particularly in the absence of a factual showing that they did not pass on some or all of the overcharges, would not be an equitable result." 578 F.Supp. at 594.

More recently, in *United States v. Exxon Corporation*, 773 F.2d 1240 (Temp.Emer. Ct.App.1985), TECA was asked to review a district court decision rendered under section 209 of the Economic Stabilization Act ("ESA"), which grants the court express authority to order restitution to victims of energy violations.[18] TECA upheld the district court's award of a refund to the states, made to benefit the consuming public. Although TECA's decision was influenced by the cost-spreading effects of the Entitlements Program, its reasoning is nonetheless pertinent here. In discussing the equitable principles that govern restitutionary distributions, TECA stated,

"prior to decontrol, if a court ordered restitution to a first purchaser, then that refund would eventually be passed along the distribution line to an ultimate consumer of petroleum products. However, in view of the 1981 decontrol of oil prices, 'there has existed no ready method of ensuring that overcharges will be

---

**18.** Section 209 of the ESA states,

[w]henever it appears ... that any individual or organization has engaged, is engaged, or is about to engage in any acts or practices constituting a violation of any order or regulation under this title, such person may request the Attorney General to bring an action in the appropriate district court ... to enjoin such acts or practices, and upon a proper showing a temporary restraining order or a preliminary or permanent injunction shall be granted without bond.... In addition to such injunctive relief, the court may also order restitution of moneys received in violation of any such order or regulation.

§ 209, 12 U.S.C. § 1904 note.

refunded to their ultimate victims, the consumer.'"

773 F.2d at 1286 (quoting *United States v. Exxon Corp.*, 561 F.Supp. 816, 854 (D.D.C. 1983)).

Finally, a presumption that makes it difficult for a direct purchaser to prove injury in the context of administrative enforcement proceedings is balanced by the existence of a contrary presumption in private enforcement actions under section 210 of the ESA. In such private actions, only a direct purchaser has standing to sue for violations of the regulatory provisions and can recover even absent proof that the overcharge was not passed on.[19] *See Stertz v. Gulf Oil Corp.*, 685 F.2d 1367, 1369 n. 3 (Temp.Emer.Ct.App.1981); *Eastern Air Lines, Inc. v. Atlantic Richfield Co.*, 609 F.2d 497 (Temp.Emer.Ct.App. 1979). In short, the Court is not persuaded that OHA exceeded its authority by requiring plaintiffs to prove that they did not pass-through the overcharges.

█ It follows almost *a fortiori* that plaintiffs' claim of injury based on "lost profits" must also fail. In presenting that claim to OHA, plaintiffs relied upon their cost banks to prove several propositions— "1) the refiners were not recovering all allowable costs in their prices, 2) they were therefore charging less than the maximum allowable prices, and 3) market forces, not the price control regulations were constraining the refiners' downstream prices." Plaintiffs' Principal Brief, Dkt. 22 at 31. Irrespective of the validity of those propositions, plaintiffs conceded during the administrative proceedings that the existence of cost banks did not prove that the particular overcharges for which plaintiffs sought reimbursement had not been passed on.

Not surprisingly, OHA found that cost banks were not, in themselves, sufficient proof of injury. OHA stated its reasons as follows:

Many factors affected the size of cost banks in a more pronounced manner than a particular overcharge. For example, changes in inventories of crude oil and refined petroleum products had a *major* impact under the DOE regulations on the amount of "unrecovered" product costs that could be banked....

Other factors contributed to the existence of large cost banks calculated pursuant to the refiner price rule. These factors include the use of incentives in the refiner price rules, such as the provisions to encourage refinery modernization and the "gasoline tilt" rule, and the occurrence of fortuitous transactions on the base date selected for calculating allowable prices under the DOE regulations....

Moreover, ... a bank of costs cannot be directly translated into a loss of profit with respect to any particular transaction. A bank of costs is an aggregate figure accumulated from many transactions.

*National Helium*, 11 DOE at 88,464–65; *Coline*, 12 DOE at 88,081.

█ Thus, OHA determined that plaintiffs could have passed on every dollar overcharged and still have maintained substantial cost banks. OHA's conclusion finds ample support in the case law. *See United States v. Exxon, supra*, 773 F.2d at 1285; *Denny Klepper*, 598 F.Supp. at 527. Indeed neither ARCO nor Mobil continue to assert that recovery should have been awarded based on their cost banks alone.[20]

19. TECA has repeatedly warned against "'[t]he commingling of private and agency enforcement devices for which Congress had made separate provision.'" *Payne 22, Inc. v. United States*, 762 F.2d 91, 93 (Temp.Emer.Ct.App.1985) (quoting *Dyke v. Gulf Oil Corp.*, 601 F.2d 557, 567 (Temp.Emer.Ct.App.1979), *cert. denied*, — U.S. ——, 105 S.Ct. 173, 83 L.Ed.2d 108 (1984)). *See also Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278, 282 (Temp.Emer.Ct.App.1980).

20. ARCO stated in Count VI of its Complaint, "OHA's refusal to recognize Atlantic Richfield's banked costs as conclusive evidence that the Company was injured as a result of National Helium's overcharges was beyond defendant's authority, not supported by substantial evidence in the record, was arbitrary, capricious, and abusive of the authority vested in OHA, and was unlawful ..." Dkt. 1 at 28. In its motion for summary judgment, ARCO withdrew Count VI

Instead, the plaintiffs claim that they adduced sufficient additional evidence which, in conjunction with the cost banks, proved that plaintiffs had lost profits. The Court is unable to find, however, that OHA's rejection of this additional evidence was arbitrary. The evidence was general in nature and unsubstantiated by hard data. It provided no further proof that the specific overcharges were not passed on to plaintiffs' customers. Indeed, it was introduced not to establish that the overcharges were absorbed, but to prove plaintiffs' own theory of injury based upon lost profits. In essence, the economic analysis and affidavits were merely another attempt to explain why the existence of cost banks proved plaintiffs were injured. Thus, the Court must agree with OHA that while the evidence suggests plaintiffs might have lost profits in the general sense, it does not link plaintiffs' alleged lost profits to the overcharges in question and it fails to establish injury within the meaning of Subpart V. Since the Court must sustain the agency's finding that plaintiffs failed to meet their burden of proof on injury, it follows that the agency's denial of restitution was also appropriate.[21]

■ Plaintiffs' due process challenge against the agency is easily answered. This Court has found that OHA applied a reasonable presumption against direct-purchaser plaintiffs in their quests for refunds. OHA's decision to apply a different presumption to certain downstream purchasers and not require proof of injury is well supported by logic and reason. The differing presumption does not violate plaintiff oil companies' due process rights.

■ ARCO also claims that it should have received a refund of $1,521,964 under

OHA's competitive disadvantage test. Dkt. 23, at 21. OHA's test did not yield a precise measurement of injury, however. The "refund range" for ARCO under the competitive disadvantage test was between $0 and $1,521,964. (*See supra* at 1207–1208.) OHA's award of $760,982 was a Solomonic attempt to apply equitable principles and the decision was thus well within the sound discretion of the agency. ARCO has not proved that OHA's award of 50% of the maximum *possible* award constitutes an abuse of that discretion.

■ Plaintiffs further allege that OHA acted arbitrarily and capriciously in denying discovery of the data and methodology used by OHA in developing its competitive disadvantage theory. Plaintiffs claim that "reasonable discovery must be permitted ... where the discovery sought is crucial to the decision that is likely to be reached and to the ability of the parties to participate effectively in the proceeding." Dkt. 22 at 49. Plaintiffs seek discovery of OHA's data and methodology primarily to attack OHA's theory, but also to scrounge for ammunition to support a claim it is entitled to an increased award under the competitive disadvantage theory. Plaintiffs' request for discovery is not "crucial" to their theory, since plaintiffs have failed to carry their burden of proving injury. The need for plaintiffs' additional discovery for purposes of attempting to enhance its award under the competitive disadvantage theory must be weighed against the fact that the award was within the range of the equitable power of OHA and that additional delay occasioned by added discovery would prolong an already protracted administrative proceeding. It is concluded on the

of the Complaint. Mobil never expressly raised the same argument in its pleadings although it was raised and rejected in the proceedings before OHA.

21. ARCO urges that OHA's award to Farmland and to the states exceeded the agency's authority to grant restitution. This contention cannot be considered on plaintiffs' motion for summary judgment. Plaintiffs lack standing to challenge OHA's distribution of refunds to third parties.

In order to wage such an attack, plaintiffs must demonstrate not only that they were injured in fact, but also that they suffered an injury that could be redressed by the Court. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Simon v. Eastern Kentucky Welfare Rights Organization,* 423 U.S. 943, 96 S.Ct. 352, 46 L.Ed.2d 275 (1975). The plaintiffs could gain nothing in this forum from an attack on agency disbursement of refunds to third parties.

facts of this case that OHA acted properly in denying plaintiffs' request for further discovery.

ARCO's motion for summary judgment seeking the proceeds of the entire National Helium escrow account, that part of Mobil's motion seeking summary judgment as to 26.7% of the Coline account as lost profits, and plaintiffs' claims for greater awards under the OHA test will be denied.

### B. Defendants' Motions for Summary Judgment

Federal defendants, Farmland, and the intervening state defendants have also moved for summary judgment. In opposition, plaintiffs attack OHA's adoption of its economic formulation for distribution and assert that even if formulation of that theory is warranted, it was incorrectly applied to them.

### 1. OHA's Motion for Summary Judgment

OHA's motion for summary judgment is granted to the extent that this Court's denial of plaintiffs' motion leaves undisturbed OHA's decision on the distribution of refunds. To the extent that, upon denial of plaintiffs' motion, OHA's motion for summary judgment is in effect a request that this Court ratify the distribution formula, the motion is denied. This Court is not empowered to issue an advisory opinion.

### 2. Farmland's and the States' Motion for Summary Judgment

In its motion for summary judgment, Farmland asks the Court to uphold the award it received from the OHA. Because plaintiffs now lack standing to challenge that award, and OHA and Farmland are in agreement over the award, Farmland's motion must be denied. This Court lacks jurisdiction to decide this issue, since there is no proper case or controversy before the Court.

For the same reason, the states' motion for summary judgment affirming their awards from OHA must also be denied.

The National Helium and Coline cases will be remanded for further refund proceedings.

An order will be issued consistent with this Opinion.