**UNITED STATES of America, Plaintiff,**

v.

**MISSOURI SELF SERVICE GAS COMPANY, James P. Tierney, Larry Gunning, Robert H. McKee, Defendants.**

No. 85–0442–CV–W–5.

United States District Court,
W.D. Missouri, W.D.

Aug. 28, 1987.

Thomas M. Larson, E. Eugene Harrison, Asst. U.S. Attys., Kansas City, Mo., Don W. Crockett, Stephen C. Skubel, Office of the Solicitor, Economic Regulatory Admin., Dept. of Energy, Washington, D.C., for plaintiff.

John H. Calvert, Alfred Hupp, Jr., Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., for defendants.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Before the Court are cross-motions for summary judgment filed by plaintiff and defendants. For the following reasons, the Court concludes that summary judgment in favor of plaintiff as to its claims is proper; however, the Court concludes that defendants' motion for summary judgment as to their counterclaims must be denied and that defendants' counterclaims must be dismissed.

### Factual Background

The facts in this case are generally undisputed. This case arises out of a payment of $120,940.05 by the United States Department of Energy ("DOE") to defendant Missouri Self Service Gas Company ("MSSGC"), which DOE alleges contained an overpayment of $45,031.50. That payment resulted from a DOE proceeding against Panhandle Eastern Pipeline Company ("Panhandle"), in which the agency, acting on behalf of Panhandle's customers, recovered price overcharges from Panhandle. MSSGC was one of Panhandle's customers. The refund to MSSGC was effectuated by DOE by means of special refund procedures pursuant to 10 C.F.R. part 205, Subpart V ("Subpart V").

### DOE's Subpart V Distribution Procedures

In February, 1979, DOE's Office of Hearings and Appeals ("OHA") promulgated regulations providing for special refund procedures. 10 C.F.R. §§ 205.280–205.288, 44 Fed.Reg. 8562 (February 9, 1979). The purpose of these regulations was to establish a framework "pursuant to which refunds may be made to injured persons" in order to remedy the effects of alleged violations resolved by DOE remedial orders or consent orders. 10 C.F.R. § 205.280. The Subpart V regulations were primarily designed for those situations in which DOE enforcement officials were unable to readily identify those persons who may have been injured by alleged or adjudicated violation, or to readily determine the amount of those persons' injuries. 10 C.F.R. §§ 205.280, 205.281(b). Thus, the purpose of these proceedings is to determine, if possible, which persons or consumers, in fact, bore the economic burden of the alleged overcharges at issue.

Pursuant to the regulations, a Subpart V proceeding may be invoked when a DOE enforcement official files a petition with OHA requesting an implementation of the special refund procedures. 10 C.F.R. § 205.281. If OHA concludes that the procedures may be appropriate, it issues a proposed decision which describes the nature of the particular refund proceeding and sets forth the standards and procedures OHA proposes to apply in evaluating refund claims. 10 C.F.R. § 205.282(a).

Following a 30–day period for public comment, OHA then issues a final decision either adopting or rejecting the procedures. After adoption, individual refund applicants are given a period of 90 days within which to file their claims. Individual decisions are then rendered by OHA with respect to each claim. 10 C.F.R. § 205.284.

### The Panhandle Consent Order and Subpart V Proceeding

On May 15, 1979, Panhandle and DOE entered into a consent order to settle DOE's claims regarding alleged overcharges by Panhandle's wholly owned subsidiary, Century Refining Company, in the resale of motor gasoline during the period of November 1, 1973 through December 31, 1975. Under the consent order, Panhandle paid DOE $280,027.98 in settlement of all DOE claims for Panhandle violations of price control regulations. The consent order required the Office of Enforcement to deposit the consent order funds into a suitable account so that the funds could be distributed to the injured persons.

On December 19, 1979, DOE's Assistant Administrator for Enforcement filed a petition with OHA asking it to implement special refund procedures for the *Panhandle* consent order funds. The petition noted that the Office of Enforcement had been unable to identify persons, if any, who were entitled to refunds remitted pursuant to the consent order or to ascertain the amounts of refunds that such persons were entitled to receive. Initially, OHA declined to accept jurisdiction of the petition, finding that "Subpart V is not appropriate in cases involving small refund amounts absent a showing of special need." 45 Fed. Reg. 68753 (1980).

However, on April 9, 1981, in response to the Office of Enforcement's request for reconsideration of this decision, OHA reversed itself and accepted jurisdiction. OHA then published notice of the proposed standards and procedures to be applied in evaluating refund claims. After notice and comment, OHA adopted the proposed procedures and directed applicants claiming refunds based on a purchase volume exceeding a monthly average of 50,000 gallons of Panhandle products to establish that they were injured by the firm's pricing practices because they had to absorb price increases rather than pass them through to downstream customers.

As a threshold showing of injury, claimants were required to submit evidence of their "bank" of unrecouped product costs.[1] In addition, because banks in and of themselves did not prove injury, OHA required applicants to submit information concerning market conditions to support any claims that these overcharges were not passed along to their own customers.

### Alleged Overpayment to MSSGC and the Individual Defendants

In 1979, Pasco Industries, Inc., a Delaware corporation, purchased all of the stock of Missouri's Self Service Gas Company from Austin and Alice Mutz, thereby becoming the sole shareholder of MSSGC. At that time, all of the stock of Pasco Industries, Inc. was owned by the individual defendants, James P. Tierney, Robert H. McKee and Larry Gunning. After the acquisition of MSSGC, the three shareholders of Pasco Industries, Inc. were appointed as directors and officers of MSSGC by the sole shareholder, Pasco Industries, Inc. Since that time, these same appointments have been repeated in each successive year.

In 1980, defendants sold the assets of MSSGC to another firm. MSSGC, however, retained the rights of its predecessor firms to file claims for injuries in Subpart V proceedings before OHA. However, all of the attorneys' fees and expenses incurred in prosecuting those claims (some $12,000) were subsequently paid directly by Pasco Industries, Inc.

On April 2, 1982, Pasco Industries, Inc. adopted a resolution dissolving itself and distributing all of its assets (including the stock of MSSGC) to a general partnership

---

1. A "bank" represents a retailer's increased product cost which can legally be passed through to its customers in the form of higher prices, but due to market or other conditions are not so passed through. *See Denny Klepper Oil v. U.S. Department of Energy*, 598 F.Supp. 522, 525 n. 5 (D.D.C.1984).

composed of the three shareholders of the corporation. The new Arizona partnership was called "Pasco Industries." A final liquidating federal income tax return was filed by Pasco Industries, Inc. for the period ending April, 1981, and included its consolidated subsidiary MSSGC. Thereafter, Pasco treated MSSGC as liquidated and, consequently, no further income tax returns have ever been filed. Thus, since April, 1981, MSSGC has conducted no business, had no income or expenses, filed no income tax returns, and held no formal meetings of either shareholders or directors.

On August 20, 1982, James P. Tierney filed an application in the *Panhandle* Subpart V proceeding on behalf of MSSGC, for itself and as assignee of Mutz Oil Company, requesting a share of the *Panhandle* escrow fund based upon the total number of gallons purchased by MSSGC from November, 1973 through December, 1975.[2]

On August 10, 1983, the OHA issued a Decision and Order with respect to MSSGC's application. It ruled that on a volumetric basis, the aggregate refund shares of MSSGC and Mutz amounted to $42,387.[3] OHA also determined that MSSGC was eligible to receive 17.34 percent of the interest accrued on the escrowed consent order funds. The pertinent ordering paragraphs provided that:

. . . .

"(2) The Director of the Office of Washington Financial Services of DOE's Office of the Controller shall take appropriate action to disburse $42,387 plus 17.34 percent of the accrued interest from the deposit fund escrow account established at the Department of the Treasury pursuant to the Panhandle Consent Order to Missouri Self Service Gas Company. . . . (3) For the purpose of calculating the appropriate share of accrued interest, the Director of the Office of Washington Financial Services of the DOE's office of the Controller shall consider as additional interest $54,478 of what remains of the principal in the Panhandle escrow account."

On August 17, 1983, James Tierney sent a letter to his two partners in Pasco Industries, Robert H. McKee and Larry Gunning, informing them that OHA had allowed MSSGC $42,387 plus interest on the Panhandle claim and estimating that they would receive an additional $10,000 in accrued interest on that amount.

On August 10, 1983, OHA referred its order concerning MSSGC to DOE's Washington Office of Financial Services for disbursement of funds. On August 18, 1983, the Office of Washington Financial Services erroneously computed the amount due MSSGC under the order and approved the issuance of a check in the amount of $120,940.00. On August 30, 1983, the United States Treasury issued a check to MSSGC for that amount.

On or about September 3, 1983, James P. Tierney received the Treasury check and

---

2. MSSGC applied for a refund for the entire 22,686,518 gallons it and its subsidiary Mutz Oil had purchased from Century Refining during the consent order period.

3. In support of its claim, MSSGC submitted information concerning its banks and certain market data. In reviewing MSSGC's submission, OHA found that Mutz and MSSGC did not even have banks of unrecouped costs for many of the periods for which MSSGC claimed refund. According to OHA, the absence of banks demonstrated that Mutz and MSSGC were able to pass through their increased product costs, including any Panhandle overcharges, to their own customers.

   With respect to the market data submitted by MSSGC, OHA found that Mutz experienced a competitive injury in 7 of the 22 months of the consent order period, and approved a refund

based on its purchases of 5,996,427 gallons of motor gasoline during those months. The OHA also found that the market data submitted by MSSGC for its own purchases showed injury only for the 238,728 gallons of gasoline it purchased from Century in December, 1975. Noting, however, that if MSSGC had elected to limit its claim to the threshold volume of 50,000 gallons per month for which it would have been granted a refund without having to demonstrate any injury from Panhandle's pricing practices, OHA authorized MSSGC a refund for each of the 22 months during the consent order period during which MSSGC purchased Panhandle gasoline, i.e. a refund for 1,100,000 gallons. Thus, OHA awarded MSSGC its *pro rata* share of the refund pool based upon the number of gallons it had purchased in relation to total purchases by other Panhandle purchasers.

transmitted it to Larry Gunning at Pasco Industries in Phoenix, Arizona by a letter dated September 2, 1983. Because MSSGC was liquidated and had no bank account, defendants faced a problem in endorsing and negotiating the check. The problem was solved on September 8, 1983 when an employee of Pasco Industries simply opened a "money market" account in the name of MSSGC at the Valley National Bank of Arizona. The check was then simply endorsed for MSSGC and deposited. The address shown for MSSGC on the bank statement was Pasco's Phoenix office.

On or about September 20, 1983, James Tierney conferred with Pasco's accounting firm, Touche–Ross, concerning the tax treatment of the $120,940.05 payment. Since the final liquidating income tax return for MSSGC and its parent corporation, Pasco Industries, Inc., had been filed in 1981, Mr. Tierney was advised by Touche–Ross that the appropriate procedure was to take the funds out of the MSSGC account, pay them to the Pasco Industries partnership, and treat the entire amount as ordinary income of the partnership. Thereafter, on September 22, 1983, an employee of Pasco Industries in Phoenix, at Mr. Tierney's direction, transferred the amount of $120,940.05 from the MSSGC account to the Pasco Industries partnership account in the same bank. There was no formal action by either the officers, directors or shareholders of MSSGC to authorize this transfer of the $120,940 from one bank account to the other.

A review of the MSSGC transaction later in September of 1983 by DOE's Washington Office of Financial Services disclosed the erroneous computation. While the OHA order had directed that the $54,478 was to be added to the accrued interest in the escrow account from which MSSGC's 17.34 percent was to be calculated, the disbursing office had erroneously added the $54,478 to the principal amount to be paid to MSSGC. Had the OHA order been properly followed, only 17.34 percent of the $54,478 would have been added to the interest amount due MSSGC.

On September 28, 1983, George Tengan of the Operations Branch of the Washington Office of Financial Services sent a letter to MSSGC, in care of Mr. Tierney, explaining that an overpayment of $45,031.50 had been made and requesting repayment by MSSGC. The letter stated that if the funds were not received within 30 days, interest would begin to accrue on the amount owed at rates established quarterly by the Department of Treasury, and the rate charged would be that in effect when the account first became delinquent. This rate was nine percent per annum on October 31, 1983.

Mr. Tierney received the September 28, 1983 letter on or about October 1, 1983. On the same day he also received a telephone call from Mr. Tengan requesting repayment of the $45,031.50. Mr. Tierney told Mr. Tengan over the telephone that MSSGC would not make such a repayment. Shortly thereafter, Mr. Tierney advised Mr. Gunning and Mr. McKee of that demand, and they agreed to leave the matter in his hands.

On November 2, 1983, Mary Arnett-Kremian, a staff member of DOE's Office of Hearings and Appeals, called Mr. Tierney. Later that day, Alfred Hupp, an attorney for MSSGC, discussed the MSSGC matter with Mr. Tierney and returned the call on behalf of Mr. Tierney on November 4, 1983. Ms. Arnett–Kremian requested payment of the $45,031 and Mr. Hupp reiterated MSSGC's earlier refusal to make such a payment, stating that the payment had been distributed to MSSGC's shareholders, that MSSGC's only asset was the *OKC* refund claim (see infra page 1237), and that the shareholders were under no obligation to repay the funds as demanded by DOE. On November 16, 1983, Mr. Hupp wrote a letter to Messrs. Gunning and McKee, forwarding copies of DOE's correspondence regarding the overpayment.

On November 28, 1983, Palma Yanni, a staff member of DOE's Office of Hearings and Appeals, called Mr. Tierney and asked him for the names of the shareholders of MSSGC. Mr. Tierney provided the requested information. On that same day, George

M. Tengan of the Washington Office of Financial Services again wrote MSSGC in care of Mr. Tierney, making a second formal request for repayment. MSSGC made no oral or written response to the November 28, 1983 letter.

On December 27, 1983, OHA issued an "ancillary order" pursuant to 10 C.F.R. § 205.288.[4], in which it found that the shareholders were under an equitable obligation to return the overpayment and ordered both MSSGC and its shareholders to remit the sum of $45,031.50 plus interest from October 31, 1983 to DOE immediately upon receipt of the Ancillary Order. Defendants ignored the Ancillary Order, and the United States filed this lawsuit on May 3, 1985 to enforce it.

### The OKC Consent Order and Subpart V Proceeding

On July 17, 1980, OKC Corp. ("OKC") and DOE entered into a consent order in which OKC agreed to pay $4,750,000 to DOE. That consent order settled all claims which DOE could have pursued under the price regulations relating to transactions by OKC involving crude oil, residual fuel oil or refined petroleum products from August, 1973 to the settlement date. As part of this consent order, the parties expressly agreed that DOE's Office of Enforcement would file a petition for special refund procedures pursuant to Subpart V.

As required by the express terms of the *OKC* consent order, the Office of Enforcement petitioned OHA on February 5, 1981 to institute Subpart V proceeding. In response to that petition, OHA initiated a Subpart V proceeding for the consent order funds on March 25, 1982. The OHA determined that Subpart V was appropriate. Following notice and an opportunity for public comment, OHA developed final refund procedures substantially identical to those adopted in *Panhandle* and other Subpart V proceedings, requiring applicants for refunds in excess of a monthly volume

of 50,000 gallons to demonstrate injury through the existence of both banks and market data showing that the overcharges were not passed through to the applicant's customers. MSSGC again applied for a refund on behalf of itself and as an assignee of Mutz.

As an initial matter, OHA disallowed MSSGC's application for those months for which it had no banks, since it concluded that MSSGC had passed through all of its product costs during that period to its customers. For the other periods, OHA examined MSSGC's market data to determine whether it had in fact been injured by OKC's alleged overcharges. OHA again found that the data showed that MSSGC had only suffered injury in some of the months for which it had banks of unrecouped costs. OHA then awarded MSSGC its *pro rata* share of the fund based upon the number of gallons purchased during the months where injury was found. That award amounted to $13,518 in principal, plus $8,973 in accumulated interest, for a total amount of $22,491.

On May 15, 1986, OHA issued a show cause order directing MSSGC to show cause why the refund of $22,491 in the *OKC* special refund proceeding would not be partially offset against the amount MSSGC owed to DOE as a result of the overpayment in the *Panhandle* proceeding. The show cause order also directed that this refund be deposited in a separate escrow account.

On May 27, 1986, MSSGC filed a response to OHA's show cause order, arguing against the transfer of its *OKC* refund on the following grounds: (1) that basic notions of fairness require that DOE bear the burden of its mistake; (2) that MSSGC was not overcompensated in the *Panhandle* proceeding; and (3) that MSSGC was not obligated to repay the DOE the alleged

4. Title 10 C.F.R. § 205.288 provides that: "The Director of the Office of Hearings and Appeals or his designee may issue any interim or ancillary orders, or make any rulings or determinations to ensure that refund proceedings, including the actions of the administration and the custodian of the funds involved in a refund proceeding, are conducted in an appropriate manner and are not unduly delayed."

overpayment because of due process considerations.[5]

On August 29, 1986, OHA issued a Supplemental Order in which it rejected MSSGC's arguments, and ordered that the $22,491 be transferred from the special escrow fund into the escrow account maintained for the *Panhandle* proceeding.

In its two-count complaint, filed on May 3, 1985, the government seeks enforcement of the DOE Ancillary Order of December 27, 1983 (Count I) and seeks restitution of the $45,031.50 overpayment from MSSGC and the individual defendants (Count II). Defendants have counterclaimed, alleging that DOE's decision to allow some claims for overcharges on a volumetric basis without regard to pass-throughs and to reduce the volumetric claim of MSSGC against the *Panhandle* fund and the *OKC* fund by the amount MSSGC allegedly passed through was in excess of DOE's authority, is not supported by substantial evidence, and has denied MSSGC due process and equal protection. In essence, MSSGC claims that the refund proceedings should not have been instituted under Subpart V and, thus, seeks to have this Court declare that DOE has acted in excess of his authority, thereby making the proceedings void.

The parties have now stipulated that this case can be decided by the briefs and other exhibits filed in this case without a trial, and have filed cross-motions for summary judgment.

In its motion for summary judgment as to its claims, the government argues that MSSGC and the individual defendants are liable based on the common law right of restitution of funds mistakenly paid to another. Additionally, the government claims that the individual defendants are required to return the mistaken payment by the express terms of the Ancillary Order and that defendants' willful failure to so comply gives rise to civil penalties pursuant to the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(3) ("EPAA"), as well as interest from the date of the Ancillary Order. In opposition to the government's motion and in their own motion for summary judgment, defendants claim that the individual defendants are not liable for restitution as constructive trustees since the overpayment has already been distributed to defendant shareholders as a dividend. Defendants also argue that the Ancillary Order is void as violative of defendants' due process right to notice and an opportunity to be heard.

Defendants have also moved for partial summary judgment as to their counterclaims, alleging that as a matter of law, the orders by DOE in which it determined the amount of refunds to which MSSGC was entitled are void as being in excess of DOE's authority, unsupported by substantial evidence, and in violation of MSSGC's rights to due process. In opposition to defendants' motion for partial summary judgment, the government first argues that MSSGC lacks standing to challenge either the department's consent orders in the *Panhandle* and *OKC* proceedings or the methods used by DOE to distribute the funds obtained in settlements of the government's enforcement actions. The government also argues that MSSGC is barred by sovereign immunity from seeking damages of any kind against the United States.

## Discussion

The first question the Court must address is whether, as defendants allege in their counterclaim, the Subpart V proceedings were a valid exercise of DOE's authority or whether the proceedings were a violation of defendants' due process and equal protection rights.

## Standard of Review

The standard of judicial review for the final administrative order at issue here is set forth in § 211(d) of the Economic Stabilization Act ("ESA"), 12 U.S.C. § 1904, as incorporated into Section 5(a)(1) of the Emergency Petroleum Allocation Act ("EPAA"), 15 U.S.C. § 754(a)(1):

**5.** Many of the arguments raised by MSSGC to the show cause order are advanced by MSSGC in the counterclaims filed in this lawsuit.

"[N]o order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are supported by substantial evidence."

The Temporary Emergency Court of Appeals ("TECA")[6], has consistently held that "a court is not empowered to substitute its own judgment for that of the agency," *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391, 1400 (TECA 1975), and must affirm the agency's decision as long as there is "no clear error in judgment and there is a rational basis for the conclusions approved by the administrative body." *Atlantic Richfield Co. v. U.S. Dept. of Energy,* 618 F.Supp. 1199, 1210 (D.Del.1985) [quoting *Grigsby v. Dept. of Energy,* 585 F.2d 1069, 1074 (TECA 1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979)]. Thus, it is only upon a "clear showing that the decision exceeds the agency's authority or is based on findings not supported by substantial evidence" can MSSGC succeed in its challenge. *Atlantic Richfield,* 618 F.Supp. at 1199.

Defendants' primary argument is that the application of Subpart V and the "no pass through" requirement to it in the *Panhandle* and *OKC* proceedings deprived MSSGC of monies it would otherwise have received had its refunds been determined on the straight volumetric basis used in other refund proceedings. Defendants, however, do not challenge the power of DOE to impose Subpart V with no pass through requirement; nor do defendants challenge the Subpart V regulation itself. According to defendants, what they do contest is the application of the burden inci-

dents of Subpart V in two proceedings when they and others were allowed to proceed free of those burdens in other matters that were otherwise identical.[7]

Defendants further allege that the decision by DOE to use Subpart V was not supported by substantial evidence in that a petition under Subpart V requires a finding that "the person filing it has been unable readily either to identify the persons who are entitled to refunds ... or to ascertain the amounts of refunds" such persons should have. 10 C.F.R. § 205.281 (1986). Thus, defendants claim that the records of the *Panhandle* and *OKC* proceedings show no evidence of facts sufficient to justify the use of Subpart V. Additionally, defendants allege that the standard used by DOE to determine whether to use Subpart V was unrelated to the requirements contained within Subpart V.

In essence, defendants seek to have this Court declare that the Subpart V proceedings are void and direct DOE to redistribute these consent order funds to various applicants, including MSSGC, solely on the basis of gallons purchased and without any proof of actual injury. However, for a number of fundamental reasons, defendants' counterclaims must fail.

■ As noted by the government, the decision to conduct both the *Panhandle* and *OKC* proceeding under Subpart V was the result of a settlement between DOE and both Panhandle and OKC. As to those consent decrees, MSSGC was not a party and, thus, has no standing to challenge those agreements. Indeed, all courts that have considered similar claims have consistently held that a non-party to a consent order between DOE and another firm has no standing to bring an action against DOE on the grounds that it should have received

---

6. The Temporary Emergency Court of Appeals ("TECA"), the court with exclusive appellate jurisdiction over all cases arising under the EPAA and ESA, has expressly held that a review of the agency's findings requires an examination of the evidence presented to the agency in the first instance and contained in the certified agency record. *DOE v. Brimmer,* 4 Energy Mgmt. Court Decisions (CCH) ¶ 26,548 at 26,523 n. 1 (TECA 1985); *DOE v. Osborn,* 760 F.2d 282, 283 (TECA 1984); *International Brotherhood of Elec-*

*trical Workers v. Boldt,* 513 F.2d 1405, 1406–07 (TECA 1975).

7. On this point, defendants point to the fact that in settlements entered into by DOE and Koch Industries, Inc. ("Koch"), and by DOE and Farmland Industries ("Farmland"), the consent orders imposed no pass through requirement as a condition for allowing claims by those overcharged.

a particular benefit under the consent order. *See, e.g. Payne 22, Inc. v. United States,* 762 F.2d 91 (TECA 1985); *Midwest Petroleum Co. v. Department of Energy,* 760 F.2d 287 (TECA 1985); *Cities Services Co. v. Department of Energy,* 715 F.2d 572 (TECA 1983); *U.S. Oil Co., Inc. v. Department of Energy,* 510 F.Supp. 910 (E.D.Wis.1981); *Town & Country Markets v. DOE,* Energy Mgmt. Court Decision 1981–84 (CCH) ¶ 26,351 (D.D.C.1981) [Available on WESTLAW, DCT database].

In *Cities Services Co.,* plaintiff Cities Service sought to intervene in a pending civil action between DOE and Pennzoil Company. Pennzoil had agreed to pay $14.75 million to the Treasury to settle DOE's overcharge claims. Cities Service claimed that, as an over-charged customer of Pennzoil, it had a legitimate interest in the settlement amount negotiated by DOE and that DOE had a legal duty to remit a portion of those settlement proceeds to Cities Service. 715 F.2d at 573. The district court rejected intervention on the grounds that Cities Service had no cognizable legal interest and, consequently, no legal standing in the dispute between DOE and Pennzoil. *Id.* On appeal, the TECA affirmed, finding that the public and enforcement actions brought under the petroleum regulations "indicate different rights" and that Cities Service had no interest in the settlement because "[t]he outcome of the instant case, an agency enforcement action brought by DOE, will in no way affect Cities' private right to sue Pennzoil directly for damages." 715 F.2d at 574.

Similarly, in *Town & Country Markets v. DOE,* a case which involved an almost identical challenge to the OKC consent order, the district court summarily dismissed the complaint on standing grounds. The plaintiff in that case asserted that DOE's settlement with OKC which called for a Subpart V proceeding impaired its ability to recover its full overcharges from OKC. The court rejected this claim, stating:

"Town and Country, however, misinterprets the character of the consent order. Essentially, a consent order is an alternative method for relief which supplements plaintiff's private right of action pursuant to § 210 of ESA." Energy Mgt. Court Decisions 28,666.

Indeed, as noted in *Bulzan v. Atlantic Richfield Co.,* 620 F.2d 278 (TECA 1980), there are fundamental differences between the public and private actions:

"[T]he administrative remedies authorized by the ESA are not designed to provide a redress for a victim who has suffered an injury because of a violation of a FEA or DOE regulation; in other words, in contrast to private remedies, administrative remedies are not concerned either with punishing a violator for his illegal conduct or with compensating a victim for his injuries. Rather, the purpose of administrative remedies ... is to insure, on a nationwide scale, the enforcement of DOE's administrative regulations.

.   .   .   .   .

[A]ny compensation that a complainant may receive through the issuance of a remedial order is simply a by-product of the agency's efforts to re-establish compliance with its regulations." *Id.* at 278–282.

■ Thus, in this case, defendants have no standing to contest the Subpart V proceedings in that they were public enforcement proceedings in which, at least as to the *OKC* proceeding, the government specifically agreed to set up a special refund proceeding under Subpart V. Unlike the proceeding in *Koch,* in which the government and Koch specifically agreed to full volumetric refunds without regard to proof of injury, the *Panhandle* and *OKC* consent orders contain no such favorable settlements. As noted by the government, the courts have repeatedly upheld DOE's Subpart V requirement that allocations from consent order trust funds be conditioned on proof that claimant did not pass through the overcharges to others. *See Atlantic Richfield v. U.S. Dept. of Energy,* 618 F.Supp. at 1211–12; *Denny Klepper v. U.S. Dept. of Energy,* 598 F.Supp. at 527. Thus, even if defendants had standing to challenge the consent orders and the Subpart V proceeding, DOE acted well within

its authority in deciding whether to proceed under Subpart V and utilize the "no pass through" requirement.

Another reason that defendants' claim must be dismissed is the fact that Section 210 of the ESA provides for a private cause of action, in lieu of a petition for refund under Subpart V, to recover overcharges in excess of applicable price regulations. Thus, defendants had the choice of either filing their petition for refunds from the Subpart V refund proceeds or bringing a private action against Panhandle and OKC directly to recover any overcharges. In *U.S. Oil Co., Inc. v. Department of Energy*, the court relied heavily on the fact that refund claimants like MSSGC have this "alternative method" of relief in concluding that plaintiffs lacked standing to challenge a consent order:

> "Rather than resulting in any injury to the plaintiffs, the proposed consent order would provide an alternative method for relief. Plaintiffs would have a right to make a claim against the four million dollar fund established by the Consent Order. Ordinarily, private litigants do not have such an alternative. Given such a situation, the court finds that plaintiffs are not injured by the lack of further remedial measures in the proposed consent order. The remedial measures set forth in the proposed consent order represents a fortuitous benefit to the plaintiffs, not an injury." 510 F.Supp. at 913.

Thus, having found that defendants lack standing to challenge the Subpart V proceedings that resulted from consent orders between DOE and other third parties, the Court concludes that defendants' two counterclaims must be dismissed. Even if defendants did have standing, their counterclaims must be dismissed since the Court concludes that DOE acted well within its authority in deciding to proceed under Subpart V.

### Government's Motion for Summary Judgment as to its Claims

In Count I of its complaint, the government seeks enforcement of DOE's Ancillary Order of December 27, 1983, in which DOE found that the shareholders were under an equitable obligation to return the overpayment. In Count II, the government invokes the Court's equity jurisdiction seeking restitution of the $45,031.50 overpayment from MSSGC and the individual defendants. The government has moved for summary judgment as to both claims.

In opposition to the government's motion and in their own motion for summary judgment, defendants argue that the individual defendants are not liable for restitution as constructive trustees since the overpayment has already been distributed to defendant shareholders as a dividend. Defendants also argue that the Ancillary Order is void or violative of defendants' due process right to notice and an opportunity to be heard.

For the following reasons, the Court concludes that defendants are liable to the government under the Ancillary Order and in restitution for the repayment of the mistaken overpayment.

### Defendants are Liable for Restitution

Preliminarily, it should be noted that in seeking restitution of DOE's mistaken overpayment to defendants, the government has invoked the equitable jurisdiction of this Court. The scope of a district court's equity jurisdiction has been delineated by the United States Supreme Court in *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). In *Porter*, the Supreme Court held that a district court has the broad, inherent, equitable duty and power to do what justice so required, stating that:

> "Unless otherwise provided by statute, all inherent equitable powers are available for the proper and complete exercise of that jurisdiction and [where] the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.... (citation omitted). Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and mould each decree to the necessities of the particular case' ... (citation omitted). It may act so as to adjust and reconcile competing claims and so as to accord full justice to all real

parties in interest.... In addition, the Court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice." 328 U.S. at 398, 66 S.Ct. at 1089, 90 L.Ed. at 1336–1337.

*See also Mitchell v. De Mario Jewelry,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); *United States v. Exxon Corp.,* 773 F.2d 1240, 1288–89 (Temp.Emer.Ct.App.1985) (Judge Becker concurring in part, dissenting in part).

In this case, the government seeks restitution for a mistaken overpayment to defendants out of the *Panhandle* fund, a fund set up to remedy overcharges by Panhandle to its customers. In other words, DOE seeks only to restore the status quo and to set things right based on the miscalculation as to how much MSSGC was entitled to out of the *Panhandle* fund. It does not seek damages against defendants, but merely seeks restitution for the *Panhandle* fund of the precise amount of the overpayment, plus interest from the date of its Ancillary Order. Thus, since this is a case involving the public interest and not private parties, then the Court has very broad equitable authority in trying to fashion a restitutionary remedy.

The law is also equally clear that the government has the inherent authority, even in absence of a particular statute, to recover funds which its agents have wrongfully, erroneously or illegally paid. *See Collins v. Donovan,* 661 F.2d 705, 708, (8th Cir.1981) ("A statute is not required to authorize the government to recover funds which its agents have wrongfully, erroneously or illegally paid"); *Maryland Small Business Development Financing Authority v. United States,* 4 Cl.Ct. 76 (Cl.Ct. 1983) (When United States pays money illegally or erroneously, it may and must sue to recover that money).

In this case, the Court cannot find a situation in which a restitutionary remedy in favor of the government would be more appropriate where, as here, the individual defendants have retained money mistakenly paid by DOE since September, 1983. As noted in *United States v. Bedford Associates,* 713 F.2d 895 (2nd Cir.1983): "Restitution is an equitable remedy that may be granted, in the sound discretion of the court, to prevent one party, at the expense of another, from retaining a benefit to which he is not entitled." 713 F.2d at 903–904. *See also United States for and on Behalf of Sunworks Div. of Sun Collector Corp. v. Insurance Co. of North America,* 695 F.2d 455, 458 (10th Cir.1982) ("One who has been unjustly enriched at the expense of another may be required by law to make restitution"); *Sauder v. Dept. of Energy,* 648 F.2d 1341, 1348 (TECA 1981) ("In equity, restitution is usually thought of as a remedy by which [a] defendant is made to disgorge illgotten gains or to restore the status quo, or to accomplish both objectives"). While defendants attempt to challenge the basis underlying DOE's use of a Subpart V refund proceeding and the pass through requirement, it is undisputed that DOE intended to award defendants $42,387, plus 17.34 percent of the interest accrued on the escrowed *Panhandle* fund. Through an erroneous computation, DOE's Washington Office of Financial Services mistakenly generated a check in the amount of $120,940, which resulted in an overpayment of $45,031.50. In other words, but for this error in calculation, DOE would never have given defendants $120,940. Thus, the Court, in an effort to put the toothpaste back in the tube in this case, concludes that MSSGC and the individual defendants, being in actual possession of the $45,031.50 overpayment, are liable in restitution for the repayment of this amount.

Additionally, the Court's equitable powers to order restitution permits the Court to deprive MSSGC and the individual defendants all enrichment they've obtained as a result of having retained the mistaken overpayment since September of 1983. Consequently, the Court must order that the restitution shall be made with interest from the date the DOE issued its Ancillary Order demanding repayment.

### DOE's "Ancillary Order" was Valid

Defendants also challenge the validity of DOE's Ancillary Order requesting repay-

ment of the overpayment. In essence, defendants argue that the Ancillary Order fails to satisfy due process in that they were denied notice of the overpayment and opportunity to be heard. Defendants' contentions, however, must be rejected.

■ To begin with, the purpose of DOE's Ancillary Order was merely to apprise defendants of the mistake and to supplement its previous order awarding MSSGC $42,387 plus interest. MSSGC had ample opportunity in the underlying petition for refund proceeding in which to challenge DOE's calculation of MSSGC's refund, which it chose not to do. It is undisputed that the individual defendants were informed that they were only entitled to $42,387 plus interest. These defendants were also placed on notice by numerous letters and telephone conversations that they were obligated to return the overpayment, which they refused to do. Thus, the Court concludes that the notice and opportunity for a hearing afforded defendants in the underlying *Panhandle* Subpart V proceeding and the repeated requests for repayment more than satisfied defendants' right to due process, thereby making DOE's December 27, 1983 Ancillary Order a valid order that was binding on MSSGC and the individual defendants.

■ However, having deemed that DOE's Ancillary Order was a valid order, the Court cannot conclude defendants' failure to comply with DOE's Ancillary Order should give rise to civil penalties, in addition to interest, pursuant to the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(3). Thus, the government's request for civil penalties must be denied.

Additionally, since the Ancillary Order was valid, then DOE acted properly in offsetting the $22,491 awarded to MSSGC in the *OKC* refund proceeding against the $45,031.50 overpayment. Thus, this restitutionary award reflects this offset.

In computing this award, the Court begins with the overpayment of $45,031.50 and adds interest at a rate of 9 per cent per annum from September 3, 1983 (the date of the overpayment) until August 29, 1986 (the date DOE offset MSSGC's refund from the *OKC* proceeding). According to the Court's calculations, this interest amounts to approximately $12,158.52. Next, the Court has subtracted the $22,491 DOE offset from the *OKC* proceeding from the $45,031.50 overpayment, leaving a balance of $22,540.50. The Court then has computed interest on this $22,491 from September, 1986 up to the date of this judgment, i.e., approximately $2,028.65. Thus, the Court concludes that the total restitutionary award to which the government is entitled is $22,491, plus $12,158.52, plus $2,028.65, for a total of $36,678.17.

Accordingly, it is hereby

ORDERED that defendants' motions for partial summary judgment as to their counterclaims and for summary judgment as to plaintiff's claims are denied and that defendants' counterclaims are dismissed. It is further

ORDERED that summary judgment is granted as to Counts I and II of plaintiff's claims against defendants and that judgment is entered against Missouri Self Service Gas Co., James P. Tierney, Robert H. McKee and Larry Gunning in the amount of $36,678.17.